UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

|  |  |
|---|---|
| NETWORK INTEGRITY SYSTEMS, INC., ) <br> ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CYBERSECURE IPS LLC, ) <br> ) <br> ) <br> Defendant. ) | Case No.: __3:25cv268__ <br><br> **JURY TRIAL DEMANDED** |

## **COMPLAINT**

Plaintiff Network Integrity Systems, Inc. ("NIS"), by and through its undersigned counsel, complains of Defendant CyberSecure IPS LLC ("CS"), and alleges as follows:

### **NATURE OF THE SUIT**

1. This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code, involving infringement of U.S. Patent No. 7,706,641 ("the '641 patent" or "patent-in-suit", attached as **Exhibit 1**, in reference to the patent claim chart, attached as **Exhibit 2**, incorporated herein by reference).

### **PARTIES, JURISDICTION AND VENUE**

2. NIS is a North Carolina corporation with a principal place of business at 1937 Tate Boulevard SE, Hickory, North Carolina 28602.

3. CS is a Maryland limited liability company headquartered in Herndon, Virginia.[1]

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and

---

[1] https://www.linkedin.com/company/cybersecure-ips/about/.

1338(a).

5. Personal jurisdiction exists over CS because it has its headquarters in Virginia where it also conducts regular business and engaged in infringement.

6. Venue is proper under 28 U.S.C. § 1400(b) in this Division and District where CS has committed acts of infringement and has a regular and established place of business.

## FACTUAL BACKGROUND

7. NIS owns patents in the field of optical fiber security and is a cyber-security business and leading provider of optical sensing technology for cyber and physical security applications specializing in optical fiber monitoring to enhance network infrastructure security across various sectors.

8. CS is also a cyber-security business that specializes in the design and development of prepackaged computer software and fiber-optic-based solutions for network infrastructure security.

9. The parties have a long history of working together. Effective October 1, 2015, the parties entered into an Exclusive Strategic Relationship Agreement ("ESR Agreement") related to integration and joint sale of technology solutions to customers.

10. Effective June 23, 2023, the parties terminated the ESR Agreement and entered into a Memorandum of Understanding ("MOU") to continue working together to service customers after the termination of the ESR Agreement. This Complaint is limited to CS's infringing activity after the termination of the ESR Agreement on June 23, 2023.

11. Effective September 5, 2024, the parties entered into a "Settlement Agreement" (the "Settlement Agreement") whereby they resolved various MOU disputes, including claims by NIS that CS improperly hired current and former NIS employees who were subject to non-

competition and/or non-solicitation clauses in their employment contracts with NIS, and that CS disclosed and/or misused confidential NIS information.

12. The '641 patent is entitled "MONITORING INDIVIDUAL FIBERS OF AN OPTICAL CABLE FOR INTRUSION" and was duly and legally issued by the United States Patent and Trademark Office on April 27, 2010.

13. The '641 patent includes method claims related to detecting movement of optical fibers of an optical fiber cable and generating an alarm indicating the movement.

14. The '641 patent is valid and enforceable.

15. NIS is the exclusive owner of all right, title, and interest in the '641 patent. NIS practices the technology disclosed in the patents and has the right to bring this action to recover damages for any current or past infringement of these patents. CS does not have a license to practice the inventions claimed in the '641 patent.

16. The '641 patent is directed to a system and method for detecting movement of optical fibers for the purpose of intrusion detection. The claims of the '641 patent are method claims that include method steps such as injecting light into fibers to be monitored and receiving light signals that have been transmitted along the fibers being monitored. At least claims 1 and 12 of the '641 patent read on a point-to-multipoint network layout where the number of fibers being monitored is greater than the number of light sources and greater than the number of sensor arrangements that detect the light being transmitted through the monitored fibers.

17. Fig. 1 of the '641 patent (set forth below) depicts an exemplary point-to-multipoint network layout.



18. NIS manufactures and sells two products that are relevant to the '641 patent. The "Interceptor" and "Vanguard," which are both interrogator type devices that provide light to optical fibers being monitored and receive light signals from those fibers. The received light signals are analyzed for abnormalities that indicate whether there is an intrusion into the cable carrying the fiber or the fiber itself. The analysis of the light signals may be performed by software in the interrogator device or by software on a separate computer providing a user interface, or both. Both the Interceptor and Vanguard devices are capable of protecting up to 8-separate zones or cable paths distributed throughout the building by monitoring strands of fibers within optical cables making up the network infrastructure.

19. A system operating with a NIS Interceptor or Vanguard device detects and reports tampering or intrusion attempts for the purposes of data theft (tapping) or denial of service attacks. The Interceptor and Vanguard devices are designed to be used in a detection system and method that utilizes a point-to-multipoint network layout.

20. On information or belief, CS has had knowledge of the '641 patent at least since the parties entered into the ESR Agreement in 2015. CS personnel have frequently visited NIS facilities where a plaque showing the cover page of the '641 patent is displayed. In addition, CS personnel attended training at NIS facilities where the NIS innovations (*e.g.*, network intrusion monitoring using point-to-multipoint network layout) covered by the '641 patent were described as "patented." NIS and CS created and distributed co-branded marketing materials that referenced NIS' "patented hub and spoke technology." Two examples of these marketing materials are attached as **Exhibit 3**. In addition, on information and belief, CS conducted a review of NIS's patent portfolio (including the '641 patent) in 2023 when the ESR Agreement was terminated.

21. Until the parties severed their relationship in 2024, CS partnered with NIS to offer both CS and NIS products to their joint customers. These joint customers included both data center customers who purchased and installed numerous Vanguard devices and practiced the claims of the '641 patent, and customers who operated Protective Distribution Systems (PDS) and purchased and installed numerous Interceptor devices. One of the parties' data center customers (the "Primary Customer") was responsible for the vast majority of the parties' data center related business.

22. During the approximately nine years that the parties co-marketed products, CS did not have a product that competed with the NIS Interceptor and Vanguard devices. CS is now offering for sale and selling a product that competes with the NIS Interceptor and Vanguard devices. CS has incorporated the functionality of the Interceptor and Vanguard devices into a newly marketed device named "Opti-Guard." CS marketing materials for the Opti-Guard device are attached as **Exhibits 4** and **5**. CS touts its Opti-Guard device to customers as a device that can "replace the [NIS] Interceptor." Ex. 5 at p. 2.

23.     As described further below, CS makes, uses, sells, and/or offers for sale products and services that infringe the '641 patent. These products and services include intrusion systems and methods that include both software and hardware devices. In particular, CS makes, uses, sells, and/or offers for sale at least the following products and services that infringe the '641 patent ("Accused Products and Services"):

      a.  Detection System and Method used in Data Centers;

      b.  Detection System and Method used in Protected Distribution Systems (PDS); and

      c.  Detection System and Method used in Manhole, Lockbox, and other Fiber Bragg Grating (FBG) Intrusion Monitoring.

<u>CyberSecure's Infringing Detection System and Method used in Data Centers</u>

24.     Until its relationship with NIS ended in 2024, CS partnered with NIS to pair its software with the NIS Vanguard device for use in data centers for monitoring movement of optical fibers. CS now offers an alternative to the NIS Vanguard device, and offers for sale, sells, and has sold its software and hardware for use in a system and method for monitoring intrusion of OSP/ISP Pathways and Conduits for various data centers having a point-to-multipoint network layout. An exemplary layout of a commercial point-to-multipoint network layout is set forth below:



25.     Use of these CS products in a system and method for monitoring intrusion of OSP/ISP Pathways and Conduits for use in an intrusion detection system with a point-to-multipoint network layout infringes at least claims 1 and 12 of the '641 patent, either literally or under the doctrine of equivalents, because such a detection system including CS products performs all of the steps required in these claims, as set forth in detail in Exhibit 2.

26.     In particular, CS has offered for sale and sold its products for use in a system and method for monitoring intrusion of OSP/ISP Pathways and Conduits for use in data centers owned by the Primary Customer that employ an intrusion detection system with point-to-multipoint network layout. The CS products and services for sale and sold for use in data centers are described on the CS website. ("Realize True Data Center Security with CyberSecure IPS", attached as **Exhibit 6**.)

27.     For certain Primary Customer data centers, CS has offered for sale and sold its products to replace existing NIS Vanguard device already in use in the point-to-multipoint network layouts in the Primary Customer data centers. In particular, NIS began providing its Vanguard devices to the Primary Customer in 2017 for use in data centers that include a point-to-multipoint network layout and are located in this Division and District. The Primary Customer has a life cycle replacement policy that requires it to replace electronic devices at least every seven years. CS has offered for sale and sold its OptiGuard device to replace Vanguard devices located in this Division and District, in response to the Primary Customer acting according to its life cycle replacement policy. The CS system and method that includes the OptiGuard and is being offered for sale and sold for use in the Primary Customer data centers with a point-to-multipoint network layout infringes at least claims 1 and 12 of the '641 patent.

28.     CS, with knowledge of the '641 patent and knowledge that the CS intrusion detection system and method used in the point-to-multipoint network layout at Primary Customer data centers infringes the '641 patent, provides assistance and instruction in connection with the installation and use of the CS intrusion detection system at the Primary Customer data centers and the knowhow to use the CS intrusion detection system in an infringing manner.

29.     CS, with knowledge of the '641 patent and knowledge that the CS intrusion detection system and method used in the point-to-multipoint network layout at Primary Customer data centers infringes the '641 patent, directs its salespeople and technical personnel to conduct troubleshooting and testing on the CS intrusion detection system used in the point-to-multipoint network layout at Primary Customer data centers.

30.     The infringing CS intrusion detection system and method is designed for use with the point-to-multipoint network layout at Primary Customer data centers in a manner that infringes the '641 patent.

<u>CyberSecure's Infringing Detection System and Method used in Protected Distribution Systems (PDS)</u>

31.     Until its relationship with NIS ended in 2024, CS partnered with NIS to pair its software with the NIS Interceptor device for use with a PDS for monitoring movement of optical fibers. CS now offers an alternative to the NIS Interceptor device – the Opti-Guard device -- and offers for sale, sells, and has sold its own products for use in a system and method for monitoring intrusion of optical fibers in a PDS.

32.     The CS products and services for sale for use with a PDS are described on the CS website. ("Alarmed Carrier PDS Solutions For Military and Government," attached as **Exhibit 7**.) CS has offered for sale and sold its products for use in a system and method for monitoring intrusion of the PDS used in a secure government facility located in the District of Columbia,

Maryland and Virginia region (the "DMV Facility").

33. The DMV Facility is well known to CS because CS knew it was competing with NIS to provide products and services to monitor PDS intrusion at the DMV Facility. CS and NIS were working with the same integration company that was offering CS and NIS products as alternative solutions to the DMV Facility. The cables used at the DMV Facility include air blown optical fibers which, although not unique, distinguish the DMV Facility from other government facilities that employ a PDS. The CS products and services offered for sale and sold for use at the DMV Facility include an intrusion detection system for a PDS with a point-to-multipoint network layout. Use of the CS products in a system and method for monitoring intrusion of the PDS used at the DMV Facility infringes at least claims 1 and 12 of the '641 patent, either literally or under the doctrine of equivalents, because such an intrusion detection system including CS products performs all the steps required in these claims, as set forth in detail in Exhibit 2.

34. CS, with knowledge of the '641 patent and knowledge that the CS intrusion detection system used in the PDS with a point-to-multipoint network layout at the DMV Facility infringes the '641 patent, provides assistance and instruction in connection with the installation and use of the CS intrusion detection system at the DMV Facility and the knowhow to use the CS intrusion detection system in an infringing manner.

35. CS, with knowledge of the '641 patent and knowledge that the CS intrusion detection system used in the PDS with a point-to-multipoint network layout at DMV Facility infringes the '641 patent, directs its salespeople and technical personnel to conduct troubleshooting and testing on the CS intrusion detection system used at the DMV Facility.

36. When deployed for use with the PDS with a point-to-multipoint network layout at the DMV Facility, the CS intrusion detection system and method is specifically designed in a manner that infringes the '641 patent.

<u>CyberSecure's Infringing Detection System and Method used in Manhole, Lockbox, and other Fiber Bragg Grating (FBG) Intrusion Monitoring</u>

37. In addition to those infringing detection systems and methods discussed above that are used with networks arranged in a point-to-multipoint layout, CS also manufactures, distributes, offers to sell and sells its "Controller," "Opti-Guard," and "Cyber Sensor" products (https://www.cybersecureips.com/our-products/) for use in a system and method for monitoring intrusion of manholes, lockboxes, and other purposes.

38. Use of the CS Controller, Opti-Guard, and/or Cyber Sensor Products for manhole, lockbox, and other FBG monitoring infringes at least claim 8 of the '641 patent, either literally or under the doctrine of equivalents, because systems including these CS products perform all the steps required in the claim, as set forth in detail in Exhibit 2. CS has published the following two documents that provide a detailed description of the use of the CS Controller and Cyber Sensor for manhole and lockbox monitoring:

    a. Cyber Sensor Installation Guide (attached as **Exhibit 8**); and

    b. CyberSecure CSS Cyber Sensor Solution (attached as **Exhibit 9**).

As shown in detail in the claim chart attached as Exhibit 2, both these documents provide support for NIS' infringement claims.

39. CS, with knowledge of the '641 patent and knowledge that manhole, lockbox, and other FBG monitoring systems that include the CS Controller, Opti-Guard, and/or Cyber Sensor Products infringe the '641 patent, provides assistance and instruction to customers in connection with the installation and use of these CS products and the knowhow to use these CS products in

an infringing manner.

40. CS, with knowledge of the '641 patent and knowledge that FBG monitoring systems that include the CS Controller, Opti-Guard, and/or Cyber Sensor Products infringe the '641 patent, directs its salespeople and technical personnel to conduct troubleshooting and testing on monitoring systems that employ these CS products.

41. On information and belief, the CS Controller, Opti-Guard, and/or Cyber Sensor Products, when employed in FBG monitoring systems, are specifically designed for use in a manner that infringes the '641 patent, either literally or under the doctrine of equivalents, and these products have no substantially non-infringing use.

42. On information and belief, CS offers products and services that infringe the claims of the '641 patent and other NIS patents, and NIS reserves the right to pursue additional infringement in this lawsuit. These products and services include, at least, other detection systems being offered for sale and/or sold to customers for use in fiber optic network layouts arranged in a point-to-multipoint configuration.

## COUNT I
(*Direct Infringement of the '641 Patent*)

43. NIS adopts and incorporates by reference all the foregoing allegations as if fully set forth herein.

44. CS has directly infringed and continues to directly infringe under 35 U.S.C. § 271(a) one or more claims of the '641 patent either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale in the United States the Accused Products and Services that infringe one or more claims of the '641 patent.

45. CS is directly infringing the claims of the '641 patent by conducting the steps of the methods recited in the claims of the '641 patent at least when CS salespeople and technical

representatives troubleshoot and test the CS systems and methods both during and after installation at end customer facilities such as the Primary Customer data centers and DMV Facility.

46. On information and belief, CS has been aware of the '641 patent at least since the date that the parties entered into the ESR Agreement.

## COUNT II
(*Inducing of Infringement of the '641 Patent*)

47. NIS adopts and incorporates by reference all the foregoing allegations as if fully set forth herein.

48. CS has induced infringement and continues to induce infringement under 35 U.S.C. § 271(b).

49. CS offers for sale, sells, and has sold the Accused Products and Services to entities in the networking sector including, but not limited to, the DMV Facility and the Primary Customer data centers.

50. CS's customers have directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), one or more claims of the '641 patent, either literally and/or under the doctrine of equivalents, by using the Accused Products and Services in the United States that infringe one or more claims of the '641 patent, as described in detail above.

51. CS has actively, knowingly, and intentionally induced, and continues to actively, knowingly, and intentionally induce, infringement of the '641 patent, by offering to sell, selling and/or otherwise supplying the Accused Products and Services, with the knowledge and intent that third parties will use the Accused Products and Services in the United States, for their intended purpose to infringe the '641 patent, and with the knowledge and intent to encourage and facilitate infringement through the dissemination of the Accused Products and Services and/or the creation and dissemination of documentation and technical information to customers and prospective

customers related to the Accused Products and Services.

52. CS, through its sales people and technical field representatives, over whom CS exerts control and direction, provides assistance and instruction in connection with installation and use of the Accused Product and Services at facilities and the knowhow to use the Accused Product and Services in an infringing manner, at all times having knowledge of the '641 patent and with the intent that personnel at the facilities operate the Accused Product and Services so that there is infringement of the '641 patent.

53. On information and belief, CS, through its sales people and technical field representatives, troubleshoot operation of the Accused Product and Services at customer facilities during and after installation of the Accused Product and Services with full knowledge of the '641 patent and that the Accused Product and Services operate in a manner that infringes the '641 patent and with the intent that the customers operate the Accused Product and Services in a manner that infringes the '641 patent.

54. On information and belief, CS has been aware of the '641 patent at least since the date that the parties entered into the ESR Agreement.

**COUNT III**
(*Contributory Infringement of the '641 Patent*)

55. NIS adopts and incorporates by reference all the foregoing allegations as if fully set forth herein.

56. CS offers for sale, sells, and has sold the Accused Products and Services to entities in the networking sector including, but not limited to, the DMV Facility and the Primary Customer data centers.

57. CS's customers have directly infringed and continue to directly infringe, under 35 U.S.C. § 271(a), one or more claims of the '641 patent, either literally and/or under the doctrine of

equivalents, by using the Accused Products and Services in the United States that infringe one or more claims of the '641 patent, as described in detail above.

58. CS has contributed and continues to contribute to the infringement by third parties, including its customers, of one or more claims of the '641 patent under 35 U.S.C. § 271(c), by selling and/or offering for sale in the United States the Accused Products and Services knowing that those products and services constitute a material part of the inventions of the '641 patent, knowing that those products and services are especially made or adapted to infringe the '641 patent, and knowing that when sold for use with a point-to-multipoint network layout those products are not staple articles of commerce suitable for substantial non-infringing use.

59. CS, through its sales people and technical field representatives, over whom CS exerts control and direction, provides assistance and instruction in connection with installation and use of the Accused Product and Services at facilities and the knowhow to use the Accused Product and Services in an infringing manner at all times having knowledge of the '641 patent and with the intent that personnel at the facilities operate the Accused Product and Services so that there is infringement of the '641 patent.

60. On information and belief, CS, through its sales people and technical field representatives, troubleshoot operation of the Accused Product and Services at customer facilities during and after installation of the Accused Product and Services with full knowledge of the '641 patent and that the Accused Product and Services operate in a manner that infringes the '641 patent and with the intent that the customers operate the Accused Product and Services in a manner that infringes the '641 patent.

61. The Accused Products and Services are designed in a manner that infringe one or more claims of the '641 patent, and the Accused Products and Services when sold for use with a

point-to-multipoint network layout are not staple articles of commerce suitable for substantial non-infringing use.

62. On information and belief, CS has been aware of the '641 patent at least since the date that the parties entered into the ESR Agreement.

## CS WILLFULLY INFRINGES THE '641 PATENT

63. NIS adopts and incorporates by reference all the foregoing allegations as if fully set forth herein.

64. On information and belief, CS has been aware of the '641 patent at least since the date that the parties entered into the ESR Agreement in 2015. Despite this knowledge, and an objectively high likelihood that its actions constitute direct and other infringement of the '641 patent, CS has engaged in infringement of the '641 patent.

65. CS has sought to replace NIS products with its own products thereby ensuring that the resulting CS optical fiber intrusion monitoring system and method would infringe the '641 patent.

66. The infringing conduct by CS of the '641 patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Network Integrity Systems, Inc. respectfully requests that this Court enter judgment against Defendant CyberSecure IPS LLC:

A. That Defendant has directly infringed the patent-in-suit;

B. That Defendant has induced infringement of the patent-in-suit;

C. That Defendant has contributed to infringement of the patent-in-suit;

D. That Plaintiff be awarded all damages adequate to compensate it for Defendant's

infringement of the patent-in-suit, such damages to be determined by a jury with pre-judgment and post-judgment interest;

E.      That Defendant's infringement was willful and that such damages be trebled pursuant to 35 U.S.C. § 284;

F.      For an order permanently enjoining Defendant and its officers, agents, servants and employees, privies, and all persons in concert or participation with it, from further infringement of the patent-in-suit;

G.      That this case be declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Plaintiff be awarded its attorney's fees, costs and expenses incurred relating to this action; and

H.      That Plaintiff be awarded such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated:  April 7, 2025

Respectfully submitted,

*/s/ Joseph L. Meadows*
Joseph L. Meadows (VA Bar No. 92729)
Howard N. Shipley (VA Bar No. 40527)
GORDON REES SCULLY MANSUKHANI, LLP
277 S Washington Street, Suite 550
Alexandria, VA 22314
T: 202-399-1009
F: 202-800-2999
jmeadows@grsm.com
hshipley@grsm.com

*Counsel for Plaintiff*

## VERIFICATION

I declare under penalty of perjury, to the best of my knowledge, information and belief, that the contents of this Complaint are true and accurate.

Dated: April 7, 2025

Dave Cunningham
President
Network Integrity Systems, Inc.